UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

A.R.,

     Plaintiff,

v.

CONGRESS HOTEL OF
ATLANTA, LLC d/b/a
CONGRESS HOTEL & SUITES,
and JOHN DOES 1-5,

     Defendants.

CIVIL ACTION FILE

NO. _____

JURY TRIAL DEMANDED

## COMPLAINT

COMES NOW Plaintiff in the above-styled action and files her Complaint as follows:

1

From approximately February 6, 2015 through February 9, 2015, Plaintiff, a 14-year old girl, was unlawfully harbored, raped, and sex trafficked at the Congress Hotel & Suites located at 5885 Oakbrook Pkwy, Norcross, Georgia 30093. Although A.R.'s sex traffickers have faced criminal punishment for their crimes, A.R. brings this suit to hold the Defendant Hotel civilly liable for its role in such activity. Given the nature of the case, Plaintiff is identified in this Complaint by her initials to prevent public disclosure of her name. Plaintiff's counsel will disclose A.R.'s full name

to Defendants and their counsel as soon as an appropriate protective order is in place.[1]

2

Defendant CONGRESS HOTEL OF ATLANTA, LLC d/b/a Congress Hotel & Suites (hereinafter referred to as the "LLC", the "Defendant", or the "Congress Hotel") is a Georgia limited liability company. The LLC was administratively dissolved by the Georgia Secretary of State on September 13, 2024. However, pursuant to O.C.G.A. § 14-11-603(b)(3) "[a] limited liability company administratively dissolved continues its existence but may not carry on any business except that necessary to wind up and liquidate its business and affairs." Additionally, pursuant to O.C.G.A. § 14-11-603(b)(3) "[t]he administrative dissolution of a limited liability company does not terminate the authority of its registered agent." The registered agent for the LLC is Thomas E. Raines, who may be served at 3296 Summit Ridge Parkway, Suite 2110, Duluth, GA 30096.

---

[1] Plaintiff is concurrently filing a Motion for Protective Order and Leave to Proceed Anonymously based on the nature of the allegations in this Complaint, which include the sex trafficking of A.R. Plaintiff's anonymity will provide for her own personal safety and will protect Plaintiff from the public disclosure of details which are intimate and personal in nature.

3.

Pursuant to O.C.G.A. § 14-11-605, to the extent a dissolved limited liability company does not discharge, make provision to discharge, or dispose of a claim against it, such claim may be enforced against the limited liability company, to the extent of its undistributed assets, or against each member receiving a distribution in winding up, to the extent of the assets so distributed to such member. Here, the identity of the members of the LLC are currently unknown to Plaintiff, so Plaintiff has used pseudonyms John Does 1-5 as placeholders for the individual members of the LLC, and once Plaintiff learns the true identities of such members, Plaintiff will amend this Complaint to substitute the true identities of such members in place of the pseudonyms John Does 1-5.

4.

Defendant Congress Hotel has been properly served with process in this action.

5.

Jurisdiction and venue are proper herein.

6.

At all times relevant herein, Defendants owned, operated, maintained, controlled, managed, and/or were responsible for securing the Congress Hotel located

3

at 5885 Oakbrook Pkwy, Norcross, Georgia 30093, from which Defendants bene-

fited financially.

7.

Defendants knew or should have known of the rampant sex trafficking and

prostitution occurring at the hotel for years, before, during, and after Plaintiff's traf-

ficking, and Defendants knew or should have known of Plaintiff's trafficking in par-

ticular for numerous reasons, including, but not limited to the following:

(a)  Upon checking into the Hotel, Plaintiffs' two traffickers were first assigned

a Hotel room that had security cameras right outside the room door.  Plain-

tiffs' traffickers escorted the 14-year-old Plaintiff to the room, but upon

seeing the security cameras right outside the door, Plaintiff's traffickers

decided they did not want to run their trafficking operation in a Hotel room

with cameras immediately outside the door because it would be bad for

business. So, Plaintiffs' traffickers requested the Hotel staff reassign them

to a different room. The Hotel staff cooperated, and Plaintiffs' traffickers

were then assigned a second room and escorted Plaintiff to the second

room.  However, the traffickers felt this room was not secluded enough for

their trafficking operation.  So, Plaintiffs' traffickers again requested the

Hotel staff offer them a third different room, which was secluded and with

no cameras nearby.  The Hotel staff again cooperated.  Finally, the

4

traffickers were assigned to a suite in Room # 317 and escorted the 14-year-old Plaintiff to that room.  Despite these concerning requests to twice be reassigned to a more secluded room without security cameras directly outside the door, the Hotel staff cooperated with and facilitated Plaintiffs' traffickers by allowing them to twice relocate their 14-year-old victim to another Hotel room.

(b)  Once inside Room # 317, Defendants' cleaning staff eventually came to the room on more than one occasion and observed Plaintiff therein.  Plaintiff recalls that on at least one of these visits in particular, the cleaning staff observed 14-year-old Plaintiff in her bra and panties with her two adult, male traffickers in the room, and the two traffickers having a visibly displayed assault style gun inside the Hotel room with them.  Additionally, after Defendants' cleaning staff opened the room door and proceeded to come inside, the two adult traffickers verbally told Defendants' staff not to come any further into the Hotel room and to leave.  A.R. then quickly got new towels from the cleaning staff and handed the cleaning staff the room trash bag, which contained used condoms in it.  Instead of acting on this alarming scenario, investigating why there was a 14-year old in her bra and panties with two adult men inside a Hotel room with a gun, or reporting the suspicious circumstances to the police, or otherwise trying to help the

distressed Plaintiff, the cleaning staff cooperated with and assisted the traffickers by allowing them to continue to harbor and traffic Plaintiff uninterrupted.

(c)   Defendants' Hotel staff and/or security cameras then observed over a short period of time approximately 12 to 15 different adult males visiting Plaintiff's Hotel room for short visits, and during the visits, Plaintiff's two traffickers would exit the room and wait outside while the male buyers statutorily raped the 14-year old Plaintiff inside the room, yet the Defendants' Hotel staff did nothing to intervene and cooperated with Plaintiff's traffickers by allowing the activity to continue uninterrupted.

(d)   While Plaintiff was being trafficked at the Hotel, Plaintiff observed numerous other females, including other young teenagers, wearing provocative clothing or lingerie in and around the public areas of the Hotel and openly meeting different adult men and then accompanying those men back to the other females' Hotel rooms, all of which activity was also visible to Defendants, yet Defendants still allowed the activity to continue.

(e)   Prior to, during, and after Plaintiff's trafficking, sex trafficking and prostitution occurred openly and obviously at the hotel on an ongoing basis and involved numerous other females, traffickers, and buyers, yet Defendants still allowed the activity to continue; and

(f)  Defendants knew or should have known of the high prevalence of sex traf-

ficking generally, in the Atlanta area, and at hotels and motels in particular,

including the Defendants' Hotel specifically.

8.

A person under the age of 18 cannot consent to having sex in exchange for

money.  Any commercial sex involving a person under eighteen (i.e. "minor sex

trafficking") is criminal sex trafficking under federal and Georgia law whether the

minor had a trafficker/pimp and does not require evidence that the victim was subject

to "force, fraud, or coercion."  18 U.S.C. § 1591(a); O.C.G.A. § 16-5-46(8)(B).

Every person who engages in commercial sex with a minor is trafficking that minor

under 18 U.S.C. § 1591(a)(1).

9.

Sex trafficking and prostitution were common occurrences at the Congress

Hotel and Defendants chose to ignore, allow, condone, facilitate, support, and/or

permit such activity at the Hotel.  Defendants are liable to Plaintiff for its actions

and failures to act.  Defendants' liability to Plaintiff is straightforward:

(a)  The Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18

U.S.C. § 1595(a), provides a cause of action to victims of sex trafficking

against "whoever knowingly benefits, financially or by receiving anything of

value from participation in a venture which that person knew or should have

known has engaged in an act in violation of" the TVPRA.  Defendants know-
ingly benefited from participation in a venture which it knew or should have
known engaged in an act in violation of the TVPRA because in the operation
of the hotel, Defendants and their hotel staff (i) rented the room at the Con-
gress Hotel to Plaintiff's traffickers, in which Plaintiff, a 14-year-old girl, was
sold for sex at the hotel; (ii) collected fees for rental of that room, and (iii) did
so notwithstanding that Defendants and their staff knew or should have known
that Plaintiff was a victim of sex trafficking at the hotel. As such, Defendants
are liable to Plaintiff for her damages under the TVPRA.

(b)    The Congress Hotel constituted both public and private nuisances under Geor-
gia law because the hotel negligently or recklessly turned a blind eye and per-
mitted illegal activities to occur at the hotel, including rampant prostitution,
sex trafficking, crimes against women, drugs, violence, and other dangerous
illegal activity. As a direct result of this nuisance, Plaintiff was sold for sex at
the Congress Hotel, causing her substantial harm.

10.

Whenever reference is made in this Complaint to any act, deed, or conduct of
Defendants, the allegation is that Defendants engaged in the act, deed, or conduct
individually or by or through one or more of their officers, directors, agents, em-
ployees, staff, or representatives who was actively engaged in the management,

8

operation, direction, control, or transaction of the ordinary day-to-day business and affairs of the Congress Hotel.

## DEFENDANTS' KNOWLEDGE AND COMPLICITY OF PLAINTIFF'S TRAFFICKING AT THE CONGRESS HOTEL

11.

From approximately February 6, 2015 through February 9, 2015, when she was 14 years old, A.R. was illegally harbored and sold for sex at the Congress Hotel. A.R. was brought to the Congress Hotel by two sex traffickers who were armed with an assault style gun and who told A.R. they were taking her to the Congress Hotel because the traffickers had been there before and it would be a good place to sell A.R. for sex.

12.

A.R. was driven to Congress Hotel by her two traffickers and was sitting in the back seat of their car. When they arrived at the Congress Hotel, they pulled their car up next to the front lobby area, and one of the traffickers went inside to pay for the room. A.R. remained inside the car but could see into the lobby area as her trafficker paid the front desk worker for the room. At the time, a second Hotel employee walked out of lobby area and waived in a friendly manner at A.R.'s second trafficker who remained in the car. A.R. remained in the back seat and saw the Hotel employee look at her. The Hotel employee then began to smoke a cigarette a short distance away from the car.

13.

The trafficker who was paying for the room then returned to the car and drove his accomplice and A.R. to a parking space at the Hotel.  The traffickers then escorted A.R. out of the car and walked her to the Hotel room that the traffickers had rented. During this whole time, the traffickers were armed with an assault style gun.

14.

On the walk to the Hotel room, A.R. saw numerous young girls and women who were standing around different parts of the Hotel wearing very revealing clothing and who appeared to be engaged in prostitution or sex trafficking activity, including talking to men or openly displaying and advertising themselves for sex.

15.

After the traffickers arrived at the first Hotel room with A.R., the traffickers decided they did not want to traffic A.R. from this room because there were security cameras right outside the door, and the traffickers thought this would be bad for their trafficking business.  So, the traffickers returned to the Hotel staff and requested a different room.

16.

The traffickers then took A.R. to a second room, but the traffickers also did not like this room because there were too many people around and it was not

secluded enough. So, the traffickers returned to the Hotel staff and requested a third room that was more secluded and without security cameras right outside the door.

17.

The Hotel staff cooperated with and assisted the traffickers by assigning them to a third room that was more secluded and did not have cameras right outside the door.

18.

The traffickers then escorted Plaintiff to Room # 317, where Plaintiff ended up staying from approximately February 6 to February 9, 2015.

19.

While A.R. was in Room #317, she was sold and statutorily raped by approximately 12 – 15 men who would come visit the Hotel room for short visits to buy 14-year-old A.R. for sex. During these encounters, A.R.'s traffickers would exit the room and stay outside until the purchased amount of time had passed, at which point they would begin to knock on the door and/or come back in.

20.

Although there were not security cameras directly next to the Hotel Room #317, security cameras were still present in the hallway, and the Hotel and/or its staff or security cameras had an opportunity to observe all of this foot traffic into the room and the above-described pattern of conduct.

21.

In addition to having an opportunity to observe this concerning conduct, the Hotel cleaning staff also physically observed A.R. with her traffickers on multiple occasions. In particular, each day the Hotel cleaning staff would come to the room and check to see if A.R. and her traffickers were going to check out of the room or stay another day. Each time, the cleaning staff observed A.R. and her traffickers. And, on one occasion in particular, A.R. recalls that the Hotel cleaning staff came to the room and opened the door and 14-year-old A.R. was standing in the room wearing her bra and panties. One of A.R.'s two traffickers called out for A.R. to not let the cleaning staff come into the room any further and that the cleaning staff needed to leave. At this time, the traffickers' assault style gun was openly displayed in the Hotel suite's living room in plain sight of the Hotel cleaning staff. Additionally, during this encounter, A.R., while still in her bra and panties, asked the Hotel cleaning staff to provide her multiple new towels as she stood there, and A.R. gave the staff the trash bag from the room, which contained used condoms in it.

22.

Despite seeing 14-year-old A.R. in her bra and panties with two adult male traffickers in possession of a gun, the Hotel cleaning staff did not investigate any further or ask A.R. if she needed help. Instead, the Hotel cleaning staff generally

did what the traffickers requested and quickly left the Hotel room after interacting with A.R.

23.

While Plaintiff was being trafficked at the Congress Hotel, she saw numerous other girls and women who were obviously being sold for sex at the Hotel. She also observed numerous other pimps or traffickers in charge of those girls at the Hotel. These women and children wore lingerie and skimpy clothing throughout the Hotel and A.R. could often hear their interactions with other men through the Hotel walls or when A.R. would open her own Hotel door and look around outside.

24.

As a result of the rampant commercial sex at the Congress Hotel, a large number of buyers frequented the hotel each day, at least dozens of buyers in total. Defendants knew or should have known that the number of daily, unknown male visitors to the Hotel, and in particular to meet girls and women in revealing clothing for short visits, was clearly indicative of sex trafficking and child sex trafficking, including that of A.R.

25.

While Plaintiff was trafficked for sex at the Congress Hotel, she exhibited numerous well-known and visible signs of a child sex trafficking victim, of which Defendants and their staff knew or should have known, including her young age,

revealing clothing, being escorted by and under the control of two adult men who were armed with a gun, the adult men trying to control and monitor her behavior and movements, and the numerous adult male strangers who would visit Plaintiff's Hotel room each day for short visits.

## EYE WITNESS ACCOUNTS OF SEX TRAFFICKING AND PROSTITUTION AT THE HOTEL

### 26.

In addition to Plaintiff, numerous other eye-witnesses observed the open and obvious sex trafficking and prostitution occurring at the Hotel. For example, witness Brittney Moore has signed a declaration under penalty of perjury that is attached hereto as **Exhibit A** and is incorporated herein.

### 27.

Eye-witness Brittney Moore stayed at the Hotel for about four to five months in early 2014.  During this time, Brittney observed that two people named Pink and Jit were "pimping out lots of young girls at the Congress Hotel."  Brittney Moore "saw a minimum of 20 different girls that Pink and Jit sold for sex at the Congress Hotel while [Moore] was there." According to Moore these girls "were all very young, and ranged in age from about 15 years old to about 22 years old." The girls "would be dressed in fishnet stocking, tops with holes showing their nipples, and other provocative clothing."  According to Moore, Pink would take pictures of the girls to post in ads, and at times, a Hotel front desk employee would be in Pink's

room when she was taking these pictures of the young girls to sell for sex. Pink told Moore that Pink had people at the hotel "in her pocket." Pink paid the front desk employees extra money to be lookouts and allow the sex sales to continue at the hotel, and employees used to come hang out and party in Pink's room. There was also a Hotel housekeeper who would allow Pink's sex operation to continue by letting the housekeeper have sex with some of the girls Pink kept at the hotel. Moore also once saw a Hotel front desk worker disconnect the wires from the cameras next to Pink's room on a particularly busy night.

28.

Witness Linda Alvarez has also signed a declaration under penalty of perjury that is attached hereto as **Exhibit B** and is incorporated herein.

29.

Eye-witness Linda Alvarez visited the Congress Hotel in July 2014. While visiting the Hotel, Alvarez saw girls working as prostitutes walking up to car windows and random men around the Hotel and the girls would proposition the men by talking to them about prices for sex. Alvarez saw girls get into the cars with random men for short periods of time and drive off to a dark corner of the parking lot for 15 or 20 minutes. On average, Alvarez saw about six girls who appeared to be prostitutes at the Congress Hotel. The ages of these girls ranged from teenagers to women in their 40s. The prostitution activity Alvarez saw happened at all hours, in the day

and night, and it was obvious and not hidden.  Alvarez saw employees walking around the hotel who would have seen the same things that Alvarez saw at the Hotel, but Alvarez never saw any employees intervene or try to stop or discourage the illegal activity.

## DEFENDANTS' KNOWLEDGE OF SEX TRAFFICKING GENERALLY

### 30.

Defendants knew or should have known of the existence of sex trafficking and its illegality more than 20 years ago, since the passage of the Trafficking Victims Protection Act in 2000 and the United Nations' adoption of the Palermo Protocol to prevent, suppress, and punish trafficking in persons.

### 31.

Defendants knew or should have known that during the relevant period, Atlanta was a national hub of sex trafficking and that crime was prevalent in the city, including at the Hotel. According to a well-publicized study commissioned by the U.S. Department of Justice, Atlanta had one of the largest illegal sex trafficking economies in the country. In 2007, Atlanta's sex trafficking economy was worth $290 million annually, and traffickers reported average weekly earnings of roughly $33,000.[2] Over the last two decades, sex trafficking has generated billions of dollars

---

[2] See Christian Boone, *Study: Atlanta's Sex Trade Highly Profitable*, Atlanta Journal-Constitution, Mar. 13, 2014, https://www.ajc.com/news/crime--law/study-

in illicit profits in metro Atlanta alone. Defendants have received and retained some of those illicit profits through renting hotel rooms used for the trafficking of Plaintiff.

32.

Defendants knew or should have known of the Atlanta area's well-publicized reputation as an "epicenter for human trafficking, [] particularly child sex trafficking,"[3] and as "the number one city for child sex trafficking."[4]

33.

Defendants knew or should have known that hotels and motels are "a particularly attractive site for criminal activity ranging from drug dealing and prostitution to human trafficking. Offering privacy and anonymity on the cheap, they have been employed as . . . rendezvous sites where child sex workers meet their clients on threat

---

atlanta-sex-trade-highly-profitable/GiuU5vZdoUo5vdUYSaOBNM (last visited Sept. 9, 2024); *see also* Meredith Dank et al., *Estimating the Size and Structure of the Underground Commercial Sex Economy in Eight Major US Cities* 30–32 (2014), https://www.urban.org/research/publication/estimating-size-and-structure-underground-commercial-sex-economy-eight-major-us-cities (last visited Sept. 9, 2024).

[3] Sally Yates, Remarks at Justice Department Event Marking National Slavery and Human Trafficking Prevention Month (Jan. 29, 2015), https://www.justice.gov/opa/speech/acting-deputy-attorney-general-sally-quillian-yates-delivers-remarks-justice-department (last visited Nov. 13, 2024).

[4] *Id.*

of violence from their procurers." City of Los Angeles v. Patel, 576 U.S. 409, 428–29 (2015) (Scalia, J., dissenting, joined by Roberts, C.J. and Thomas, J.).

34.

Defendants knew or should have known the following: The National Human Trafficking Hotline has reported that over 91 percent of the calls it received involving hotels and motels reported sex trafficking, and another 2.6 percent reported a combination of sex and labor trafficking.[5] A 2012 study found that 63 percent of trafficking incidents occurred in hotels.[6] And the Polaris Project found that "75 percent of [trafficking] survivors . . . reported coming into contact with hotels at some point" during their exploitation.[7] Unfortunately, "94 percent" also "disclosed they never received any assistance, concern, or identification from hotel staff."[8]

---

[5] National Human Trafficking Hotline, *National Hotline Cases Occurring in Hotels and Motels: United States 1/1/2012–12/31/2016*, at 3, https://humantraffickinghotline.org/sites/default/files/Hotel%20and%20Motel%20Topical.pdf (last visited Nov. 13, 2024).

[6] Jon Conte et al., *Businesses Ending Slavery and Trafficking, Inhospitable to Human Trafficking Program Evaluation* 5 (July 2014), [https://web.archive.org/web/20210511135432/https://www.bestalliance.org/uploads/5/0/0/4/50047795/itt_program_evaluation.11_without_appendix.pdf].

[7] Polaris Project, *On-Ramps, Intersections, and Exit Routes: A Roadmap for Systems and Industries to Prevent and Disrupt Human Trafficking* 16 (2018), https://polarisproject.org/wp-content/uploads/2018/08/A-Roadmap-for-Systems-and-Industries-to-Prevent-and-Disrupt-Human-Trafficking-Hotels-and-Motels.pdf (last visited Nov. 13, 2024).

[8] *Id.* at 23.

35.

Defendants knew or should have known that attorneys for the hotel industry
estimated and reported to hotel industry representatives that eight out of ten human
trafficking arrests occur in or around hotels,[9] and that the industry had been warned,
among other things, to "Make sure hotel not complicit," "Manager not looking the
other way," and "No pay off for silence or lack of curiosity."[10]

36.

Defendants knew or should have known that the organization called End Child
Prostitution and Trafficking (ECPAT-USA) launched The Code of Conduct for the
Protection of Children from Sexual Exploitation in Travel and Tourism (the "Code")
in the United States in 2004.[11]

37.

Defendants knew or should have known that the Code, which lays out well-
established best practices for the hospitality industry to identify, address, and deter

---

[9] Rich Keating, *Human Trafficking: What Is it and How It Impacts the Hospitality Industry* 6 (presentation at AHIA Sprint Conference 2013), [https://web.archive.org/web/20191030203754/http://www.ahiattorneys.org/aws/AHIA/asset_manager/get_file/92983].

[10] *Id.* at 19.

[11] *See The Code*, ECPAT-USA, www.ecpatusa.org/code/ (last visited Nov. 14, 2024).

sex trafficking, identifies six reasonable and logical steps hotels and motels can take:

(a)     establish corporate policy and procedures against sexual exploitation of children;

(b)     train employees in children's rights, the prevention of sexual exploitation and how to report suspected cases;

(c)     include a clause in further partner contracts stating a common repudiation and zero tolerance policy of sexual exploitation of children;

(d)     provide information to travelers on children's rights, the prevention of sexual exploitation of children and how to report suspected cases;

(e)     support, collaborate and engage stakeholders in the prevention of sexual exploitation of children; and

(f)     report annually on the company's implementation of Code-related activities.

38.

Defendants knew or should have known that ECPAT is only one of several high-profile organizations that have for years given hotels and motels the tools to address the scourge of sex trafficking at hotels.

39.

Defendants knew or should have known that during the relevant period the Department of Homeland Security ("DHS") published guidelines to help hotels and

motels detect and respond to human trafficking. DHS's guidelines instruct house-keeping, maintenance, front desk, and security, among other hotel personnel, to be vigilant in looking for signs of human trafficking at hotels and motels, such as:

(a)    persons who show signs of malnourishment, poor hygiene, fatigue, sleep deprivation, untreated illness, injuries, or unusual behavior;

(b)    persons who lack freedom of movement or are constantly monitored;

(c)    persons who have no control over or possession of money or ID;

(d)    persons who dress inappropriately for their age or have lower quality clothing compared to others in their party;

(e)    requests for room or housekeeping services (additional towels, new linens, etc.), but denial of hotel staff entry into the room;

(f)    the presence of multiple computers, cell phones, pagers, credit card swipers, or other technology in the room;

(g)    extended stay with few or no personal possessions in the room;

(h)    excessive amounts of sex paraphernalia in rooms (condoms, lubricant, lotion, etc.);

(i)    the same person reserves multiple rooms;

(j)    a room is rented hourly, less than a day, or for an atypical extended stay;

(k)    attempts to sell items to or beg from patrons or staff;

(l)   cars in the parking lot regularly parked backward, so the license plates are not visible;

(m)   loitering and solicitation of male patrons;

(n)   waiting at a table or bar and picked up by a male (trafficker or customer);

(o)   persons asking staff or patrons for food or money; and

(p)   persons taking cash or receipts left on tables.

40.

Without a market—a conveniently located and anonymous place to confine humans, exchange money, and have sex—sex trafficking would cease to exist. In Plaintiff's case, the Congress Hotel, for a fee, provided this market for Plaintiff to be confined and sold.

## COUNT 1
## STATUTORY LIABILITY: SEX TRAFFICKING 18 U.S.C. § 1595

41.

Plaintiff incorporates the paragraphs above as if fully restated herein.

42.

In violation of the Trafficking Victims Protection Reauthorization Act ("TVPRA"), 18 U.S.C. § 1595(a), Defendants knowingly benefitted from participation in a venture that Defendants knew or should have known engaged in acts in violation of the TVPRA.

43.

Defendants knowingly benefitted from Plaintiff's sex trafficking by receiving revenue generated by the operation of the Hotel, including the revenue generated for the room in which Plaintiff was trafficked.

44.

Defendants participated in a hotel venture and knew or should have known that their operation of the hotel violated the TVPRA by harboring and maintaining Plaintiff so that she could be sold for sex at the Hotel.   Defendants also participated in a venture by cooperating with and allowing Plaintiff's sex traffickers to harbor and traffic Plaintiff at Defendants' Hotel.

45.

The venture in which Defendants participated was in or affecting interstate commerce.

46.

Defendants knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives, participated in Plaintiff's minor sex trafficking at the Hotel. Defendants knew or should have known of this participation.

47.

Defendants also knew or should have known the venture engaged in acts in violation of the TVPRA because Defendants' agents, employees, and representatives knew or should have known of other sex trafficking and sex crimes at the Hotel before and while Plaintiff was trafficked for sex at the Hotel.

48.

Defendants are directly and vicariously liable under 18 U.S.C. § 1595(a) for the actions of their agents and representatives.

49.

Plaintiff has suffered substantial physical, emotional, and psychological harm and other damages as a direct and proximate result of Defendants' participation in this venture.

50.

Defendants are liable to Plaintiff for her damages in an amount to be proven at trial, including reasonable attorneys' fees and punitive damages under 18 U.S.C. § 1595(a).

51.

All Defendants are jointly and severally liable for damages arising from the indivisible injuries they caused Plaintiff, whose damages were proximately caused by the acts discussed in this count.

# COUNT 1I
## <u>NUISANCE</u>

### 52.

Plaintiff incorporates the Paragraphs above, as if fully set forth herein.

### 53.

O.C.G.A. § 41-1-1 provides that "A nuisance is anything that causes hurt, in-convenience, or damage to another and the fact the act done may otherwise be lawful shall not keep it from being a nuisance.  The inconvenience complained of shall not be fanciful, or such as would affect only one of fastidious taste, but it shall be such as would affect an ordinary, reasonable man."

### 54.

O.C.G.A. § 41-1-2 provides that "Nuisances are either public or private. A public nuisance is one which damages all persons who come within the sphere of its operation, though it may vary in its effects on individuals. A private nuisance is one limited in its injurious effects to one or a few individuals."

### 55.

O.C.G.A. § 41-1-3 provides that "A public nuisance generally gives no right of action to any individual.  However, if a public nuisance in which the public does not participate causes special damage to an individual, such special damage shall give a right of action."

56.

O.C.G.A. § 41-1-4 provides that "A private nuisance may injure either a person or property, or both, and for that injury a right of action accrues to the person who is injured or whose property is damaged."

57.

O.C.G.A. § 41-3-1 provides that "Whosoever shall knowingly erect, establish, maintain, use, own, or lease any building, structure, or place for the purposes of sexually related charges shall be guilty of maintaining a nuisance; and the building, structure, or place, and the ground itself in or upon which such sexually related charges occurred or were conducted, permitted, carried on, continued, or shall exist, and the furniture, fixtures, and other contents of such building or structure shall be deemed to be a nuisance."

### *Public Nuisance*

58.

The Hotel's history of rampant crime and illegal sex activity created a spillover effect that led to other crime occurring in the surrounding area.

59.

The Hotel caused or contributed to a blighting effect on the surrounding community, so that the Hotel negatively damaged all persons who came within the sphere

of operation of the crime, sex trafficking, and prostitution at the Hotel, although the effects on each person may have varied.

60.

The illegal prostitution and sex trafficking nuisance occurring at the Hotel had an appreciable blighting effect on the surrounding community, permitting persons of questionable character, and encouraged idleness, loitering, vagrancy, and had a tendency to breed crime and debauch the morals of the community.

61.

The acts and omissions of Defendants in permitting prostitution and sex trafficking at the Hotel caused special damages to Plaintiff, as she was the victim of child sex trafficking at Defendants' nuisance hotel and suffered damages to her health, including mental and emotional harm, pain and suffering, and Defendants are liable to Plaintiff for all such damages.

***Private Nuisance***

62.

Additionally, or in the alternative, the Hotel constituted a private nuisance because its operation at the very least injured the numerous victims of crimes that occurred there, including specifically victims of sex crimes, like Plaintiff.

63.

The Hotel created or maintained a continuous or regularly repeated act or condition on the property (of similar past crimes and sex crimes), which caused Plaintiff's injury.

64.

Among other things, Plaintiff's traffickers selected this nuisance Hotel as a good location to sell Plaintiff for sex because this motel was known to allow such activity to occur and/or the Hotel failed to enact any measures to stop such activity from occurring.

65.

Thus, as a direct result of this hotel being a nuisance, with a history of many repeated crimes occurring at the property, Plaintiff was sold for sex at this Hotel and was harmed and damaged as a result of same.

### *Nuisance per se pursuant to O.C.G.A. § 41-3-1*

66.

The Hotel constituted a statutory nuisance per se under Georgia law because the Hotel knowingly and/or negligently turned a blind-eye and permitted illegal sexually related crimes to occur at the Hotel including rampant prostitution, pandering, pimping, and sex trafficking.

67.

Prior to and following the minor sex trafficking of Plaintiff, Defendants failed to act on its knowledge of prior prostitution and sex trafficking, and failed to act to correct, prevent, or warn of the prostitution and sex trafficking occurring at the Hotel, and the dangerous environment created on the property. Defendants' failure to take appropriate action to remedy or reduce the danger to the public, including Plaintiff, allowed the dangerous environment at the Hotel to continue to exist unabated.

68.

Plaintiff was directly harmed as a result of the Hotel being a nuisance that permitted illegal sexual activity to occur there.

69.

Defendants are liable for nuisance (public nuisance, private nuisance, and/or statutory per se nuisance pursuant to O.C.G.A. § 41-3-1) by reason of their failure to remedy the dangerous condition of prostitution and sex trafficking that persists over a period of time as a continuous and repetitious condition and of which Defendants had express notice and knowledge, and whereby Plaintiff was a direct victim of such activity.

## **DAMAGES**

70.

Plaintiff incorporates the paragraphs above as if fully restated herein.

71.

As a proximate and foreseeable result of Defendants' violations of the TVPRA and Georgia law, Plaintiff sustained personal injuries, mental and emotional pain and suffering, experienced mental anguish, and suffered other damages as will be proven at trial. Plaintiff brings each and every claim permissible under Georgia and federal law against Defendants for injuries suffered in the incident at issue, and to recover for all special damages, economic losses, medical expenses, necessary expenses, pain and suffering, and all compensatory, special, actual, general and punitive damages permissible under Georgia and federal law. Plaintiff seeks all compensatory, special, economic, consequential, general, punitive, and all other damages permissible under Georgia and federal law, including, but not limited to:

(a)   Personal injuries;

(b)   Past, present and future conscious pain and suffering;

(c)   Loss of enjoyment of life;

(d)   Medical expenses;

(e)   Mental anguish and emotional distress;

(f)   Loss of past, present, and future wages;

(g)   Incidental expenses;

(h)   All special, compensatory, economic, punitive, and other damages permissible under Georgia and federal law; and

(i)    Consequential damages to be proven at trial.

72.

Plaintiff is entitled to an award of punitive damages without limitation or cap because the actions of Defendants and their employees were willful and wanton and showed an entire want of care, which raises the presumption of a conscious indifference to consequences.

73.

Defendants' actions evidence a species of bad faith, were and are stubbornly litigious, and have caused Plaintiff undue expense. Thus, Plaintiff is entitled to recover her necessary expenses of litigation, including an award of reasonable attorneys' fees and expenses required by this action. (O.C.G.A. §§ 13-6-11, 9-11-68 and 9-15-14, and 18 U.S.C. § 1595(a)). Furthermore, Plaintiff is entitled to all expenses of litigation and attorneys' fees pursuant to all other Georgia and federal statutory and common laws.

WHEREFORE, Plaintiff prays for a judgment to be awarded to her and against Defendants for the following:

(a)    Process issue as provided by law;

(b)    Plaintiff be awarded actual damages in amounts to be shown at trial from Defendants;

(c)     Plaintiff be awarded all general, special, compensatory, economic, conse-

quential, punitive and other allowable damages in accordance with the en-

lightened conscience of an impartial jury from Defendants;

(d)     Plaintiff be awarded a trial by jury; and

(e)     Plaintiff have such other relief as this Court deems just and appropriate

under the circumstances.

TRIAL BY JURY IS HEREBY DEMANDED.

Respectfully submitted on November 13, 2024.

ANDERSEN, TATE & CARR, P.C.

*/s/ Tyler Dillard*

PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
TYLER A. DILLARD
tdillard@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile

## CERTIFICATE OF COMPLIANCE

Under Local Rules 5.1(C) and 7.1(D), I hereby certify that the foregoing filing complies with the applicable font type and size requirements and is formatted in Times New Roman, 14-point font.

Respectfully submitted on November 13, 2024.

ANDERSEN, TATE & CARR, P.C.

*/s/ Tyler Dillard*
PATRICK J. MCDONOUGH
Georgia Bar No. 489855
pmcdonough@atclawfirm.com
TYLER A. DILLARD
tdillard@atclawfirm.com
JONATHAN S. TONGE
Georgia Bar No. 303999
jtonge@atclawfirm.com
JENNIFER M. WEBSTER
Georgia Bar No. 760381
jwebster@atclawfirm.com

One Sugarloaf Centre
1960 Satellite Boulevard, Suite 4000
Duluth, Georgia 30097
(770) 822-0900 | Telephone
(770) 822-9680 | Facsimile